BLACK *v.* MORTON.

5-2516                                                    352 S. W. 2d 177

Opinion delivered December 18, 1961.

[Rehearing denied January 15, 1962.]

*Alston Jennings, Sol J. Russell, C. Byron Smith, Jr.,* and *Reed W. Thompson,* for appellant.

*Carl Langston, W. J. Walker* and *L. A. Hardin,* for appellee.

SAM ROBINSON, Associate Justice. Ward M. Black, who operated a drug store on Asher Avenue in Little Rock, died on the 19th day of November, 1958. On the first day of October, 1959, there was offered for probate in the Pulaski Probate Court what purported to be Black's will, dated October 29, 1958. The appellants herein contested the validity of the will, alleging that it is a forgery and not Black's genuine will. After a rather extensive trial, the probate court held the will to be valid and admitted it to probate. There was an appeal to this

Court and here a minority of three members of the Court thought the preponderance of the evidence proved the alleged will to be a forgery, and at that time voted to reverse the judgment with directions to find against the will. But the majority of four members of the Court felt that the cause should be sent back for further development. *Black* v. *Morton,* 233 Ark. 197, 343 S. W. 2d 437.

On remand, additional evidence was introduced and again the probate court upheld the validity of the will. The case is here on appeal for the second time. We have again carefully examined the entire record, including the new evidence, and it is our opinion that the preponderance of the evidence proves that the will is a forgery. The following is a copy of the will:

I will devise and bequeath to Cecil. C. Morton my drugg store and it's contents and the land on which it is located said property being located at 4200 asher avenue Little Rock Ark. and money in store Worthen Bank and at home or house.

second I devise and bequeath to Olive Persiqian and Clio Thompson my home contents and land which it is located also the rent house at 4208 west 29th st. and land which it is located also the land on corner 29th. and lewis L.R Ark. to be equally divided share and share alike.

third I devise and bequeath to my brother Walter L Black all my land near Clarksville in Johnson County and to his son Walter L Black Jr. I devise and bequeath my security,s purchased from L. J. MacKool

fourth I devise and bequeath to Lois Hardcastle My sister in law and Marry Pet ers 1000 dollars each to be paid out of the drug store by C.C. Morton with in six months if possible

fifth I direct that the insurance policy with National Life and Accident be used for funeral expense,s I also direct if any Medical expence occur this I want and direct C.C.Morton to pay this out of the store or his own money

subscribing my name this the 29th day of October 1958

/s/ W. M. Black

/s/ M. M. Hodge

/s/ W. F. Hardester

Appellants contend that the will is an outright forgery; that Ward M. Black did not write, dictate or sign it. On the other hand, appellees contend that Mr. Black borrowed a typewriter from Mrs. C. C. Morton, ex-wife of the principal beneficiary under the will, and typed the will at his home, making a carbon copy; that he then brought the original and a copy to his drug store on Asher Avenue and there signed the original copy, at the same time making a carbon copy of his signature on the carbon copy of the will, and asked M. M. Hodge and W. F. Hardester to sign the will as witnesses, which they did in a like manner, that is, signing the original but causing a carbon copy of the signature to appear on the carbon copy of the will. Proponents of the will further contend that Black then thought the carbon copy was clearer than the original and therefore destroyed the original, keeping the carbon copy as his genuine will and turning it over to Hodge with instructions to keep it for some length of time, "six or eight months or a year" after his death, and then to turn it over to Miss Clio Thompson, Black's cousin and one of the beneficiaries under the alleged will. A few weeks after the date of the purported will, Mr. Black died. Appellees claim Mr. Hodge kept the will for about ten months thereafter and then got in touch with Miss Thompson and turned it over to her.

At the time of his death Mr. Black was 71 years of age. His wife had died in 1949. He had no children, but was survived by a brother, Walter L. Black, Sr.; a nephew, Walter L. Black, Jr.; an aunt, Mrs. Roxie Thompson; and two cousins, Miss Clio Thompson and Mrs. Olive Perzigian. Miss Thompson filed the petition to admit the will to probate on October 1, 1959, and notice of offering the will for probate was signed by her attorneys, Howell.

Price & Worsham. On October 8th, seven days later, the court granted a petition filed by Miss Thompson requesting that she be allowed to withdraw the will for the purpose of having it examined by a handwriting expert.

On October 20th Walter L. Black, Jr., individually and as administrator of the estate, and Walter L. Black, Sr., filed contests of the will, alleging it to be a forgery. Notice of the filing of the contests was given to all those named as beneficiaries in the questioned will, and to Howell, Price & Worsham, attorneys for Miss Clio Thompson. On November 5, 1959, Miss Thompson filed a petition asking that a co-administrator be appointed. Howell, Price & Worsham, the attorneys who filed the will for probate and who were attorneys for Miss Thompson at the time the will was withdrawn to be examined by a handwriting expert, no longer represented her.

The value of the estate is a little over $100,000. Of this sum C. C. Morton, the principal beneficiary under the purported will, would receive property of the value of more than $75,000. In 1944, Morton had been convicted in Saline County of the crime of robbery and sentenced to 12 years in the penitentiary, but he had worked for Mr. Black about nine years at the time of Black's death. There is a strange relationship between Morton and witnesses to the purported will that is not likely to be just coincidental. Morton was by far the principal beneficiary under the purported will; Hodge and Hardester claim to have witnessed the will; Hodge denies that he knew Morton, although Hodge's stepdaughter worked at a store owned by Morton and his then wife; and Hodge claims to have been in Black's drug store, where Morton worked, many times. In addition, Hodge had been to Morton's variety store, where his stepdaughter worked for the Mortons. It was only a block from his home. Hardester worked for Hodge, and Morton's ex-wife produced the typewriter on which the will was written.

The will is not an original typewritten and signed instrument; both the typing and the alleged signature of the purported testator and the signatures of the witnesses are carbon copies. All the circumstantial evidence indicates that the will is a forgery and there is the direct testimony of Mr. Charles Andrew Appel of Washington, D. C., a highly qualified examiner of documents who has been doing such work since 1930 and who worked in that capacity for the F. B. I. from that time until 1948, when he retired from Government work. He has since been a private examiner of documents. Mr. Appel testified that in his opinion the purported will is a forgery; that it is not signed by W. M. Black. Mr. Appel went into great detail as to how he arrived at that conclusion, and his testimony is convincing.

On the other hand, the proponents of the will produced as a witness Dr. Orlando W. Stephenson, Sr., of Morrilton, Arkansas, who testified as an expert and gave his opinion that the alleged signature of Mr. Black is genuine. But we are not impressed by the testimony of Dr. Stephenson. He testified that he has studied questioned documents in Cairo, Egypt; Athens, Greece; Naples, Italy; Rome, Paris and London; that he has the degrees of Bachelor of Science, Master of Arts and Doctor of Philosophy, but that he is now a deputy sheriff in Conway County, Arkansas. In our opinion the testimony of Mr. Appel far outweighs the testimony of Dr. Stephenson.

In support of their theory of the will, proponents produced Mr. Hodge as a witness. He testified he lives at 1900 Rice Street, Little Rock, which is a considerable distance from the Black drug store; that he operates a service station at 28th and Arch Streets and formerly had a service station at Geyer Springs.

It is not shown that Mr. Black's acquaintance with Hodge was such that Black as a reasonable man would deliver to Hodge for safekeeping Black's will disposing of an estate valued at more than $100,000. In fact, from the evidence it is inconceivable that such a thing hap-

pened. At the most, Hodge had only a passing acquaintance with Black. Hodge was asked:

"Q. Did you trade at his [Black's] drug store?

A. Well, sometimes; yes, sir."

Hodge never visited in Black's home and there is no showing that there was any social contact between them whatever, and no showing that Black even knew where Hodge lived, and in all probability he did not know Hodge's address. Although Hodge claims he had borrowed money from Black, we give no more credence to his statement in that respect than we do to his testimony that Mr. Black asked him to sign his will. There is absolutely no reasonable explanation of why Mr. Black would deliver such an important document as his will to Hodge with instructions to keep it some six or eight months or a year after his death before divulging the fact that a will existed. There was a genuine will of Mr. Black's, dated March 29, 1949, in his safe at his drug store, where one would expect to find such an instrument, but the sole beneficiary in that will was Mr. Black's wife, who predeceased him.

In regard to his assertion that Mr. Black delivered to him the purported will involved here, Hodge testified:

Q. He didn't fold it [the will] up and hand it to you?

"A. He didn't fold it. He handed it to me just like that and he said, 'How does that look' and I said, 'I don't see any ink spots on it.' "

Of course, Mr. Black did not need to hand the will to Hodge to determine if there were any ink spots on it, and there certainly is no showing that Hodge is capable of making any determination as to the validity of the will.

If Black and Hodge had been such close friends that Mr. Black would give him his will for safekeeping, the chances are that Hodge would have gone to Mr. Black's funeral. He did not go to the funeral. Moreover, accord-

ing to Hodge's testimony, he never went in the drug store again after Mr. Black died, although he claims he had the will, and the principal beneficiary, Morton, was working in the drug store. According to Hodge's testimony, after months had passed he worried about the situation and talked to the pastor of his church about it and then took the will to an attorney before he ever called Miss Thompson.

Hodge is not a beneficiary under the alleged will, and has no interest in it, according to his testimony. In these circumstances it is hard to understand why the will would cause him so much trouble that he would go and talk to his pastor about it and go to see a lawyer about it, if Mr. Black had simply instructed him to deliver the will to Miss Thompson some six or eight months or a year after Black's death. Although Hardester claims he also signed the instrument as a witness, Hodge never told Hardester that he had possession of the will.

Hodge claims that he was such a frequent customer at the drug store that Mr. Black entrusted to his care the important will, but he says that he did not know Cecil Morton, although Morton worked right in the store for Mr. Black. Hodge further testified that he never met Cecil Morton until he met him with Miss Thompson after the will had been delivered to Miss Thompson. He testified that he did not even know what Morton did. Hodge testified:

"Q. Was—Now, that was the first time you had ever seen Clio Thompson or Cecil Morton?

"A. No, no, I had seen Cecil Morton a number of times, but I never had personally been made acquainted with him. I never personally met him until that particular morning.

"Q. Did you know who he was and what he did?

"A. No.

"Q. Didn't have any idea?

"A. No."

Later, he says that he knew that Morton worked at the drug store. His testimony in this regard is so contradictory that it is beyond belief. According to his testimony, although Hodge knew of Black's death, he did not discuss the will at all with anyone until about ten months later. All in all, Hodge's testimony is so contradictory, unsatisfactory and unbelievable that it carries no weight at all.

The testimony of Hardester deserves no more credit than the testimony of Hodge. Hardester worked for Hodge. He claims that he went to the drug store with Hodge and while there Hodge asked him to come to the rear of the store, where Mr. Black asked him to sign his will. It will be recalled that Hodge testified that the original of the will was not nearly as clear as the carbon copy and therefore the original was destroyed at the time it was signed and the copy was kept as a genuine will. It is agreed by the parties that the will involved here is a carbon copy. Hardester testified on cross examination:

"Q. Now, Mr. Hardester, that is not your signature, but it is a carbon copy of your signature, is that right?

"A. That's my signature. I wrote that.

"Q. You mean that's the mark you made with the pen?

"A. Yes, sir, I wrote that. That's my signature. I wrote it myself.

"Q. Now, please understand my question, Mr. Hardester. Is this the piece of paper that you wrote on or is this the paper that was under the —

"A. That's the paper I wrote on.

"Q. Oh, this is the piece of paper that you wrote on?

"A. Yes, sir, right there.

"Q. You are positive of that?

"A. Yes, sir, I know it.

"Q. So this is not a carbon copy of what you wrote on?

"A. That's the one I wrote on.

"Q. You actually wrote that yourself on that piece of paper?

"A. That's right.

"Q. You didn't write it on another piece of paper through carbon?

"A. No, sir, that's the one I wrote it on myself.

"Q. That's the one you wrote it on yourself?

"A. That's right.

"Q. And then this piece of paper is a piece of paper that you were looking at at the time you wrote your name, is that correct?

"A. Yes, sir, I wrote that name and wasn't no carbon over it. That's the piece of paper I wrote.

"Q. That's the top piece of paper on which you wrote your name?

"A. That's right.

"Q. You are sure of that?

"A. I know it is. Yes, sir, I am sure of that.

"Q. No question about that?

"A. No, sir, that's the —

"The Court: Do you know the difference between a carbon and original?

"Mr. Jennings: I will let him look at it.

"A. This is the original I wrote on, on top, right there."

Later, Hardester testified that Miss Clio Thompson brought a piece of paper out for him to sign; that he did not know what the writing was on the paper; that he had never seen Miss Thompson before in his life; and without reading the paper at all he signed it.

"Q.  You paid no attention whatever to what it was she was asking you to sign?

"A.  No, I·was busy.

"Q.  Handwritten or typewritten?

"A.  I won't say.

"Q.  Was there anything on it?

"A.  Yes, there was writing. I don't know whether it was typewriting.

"Q.  You just don't know, is that right?

"A.  I don't know. I didn't read it."

Later he testified that he did not think he had told Miss Thompson that he signed the will. He stated: "I don't think I told her I had signed it. I might did. I don't remember what I told."

The record in this case is voluminous and of course it is impractical to put all of the evidence into this opinion. But there are many things in the record that when put together are thoroughly convincing that the will is a forgery. Mrs. Hardcastle, a sister of Mr. Black's deceased wife, had worked for Mr. Black for years as his bookkeeper. She worked in this capacity one day a week and the work was done at Mr. Black's home. Sometimes she would take with her to his home her portable typewriter. Mr. Black did not mention to her that he had recently made a will. Under the terms of the alleged will, Mary Peters, a sister of Mrs. Hardcastle, was left a small amount. In the will her name was spelled "Marry." Mrs. Hardcastle testified that definitely Mr. Black knew her sister's name was spelled "Mary."

James Pearrow worked in the drug store every week day from 4 to 7 o'clock and on Saturdays and Sundays from 9 to 7, and he could not say that he had ever seen Hodge or Hardester before Mr. Black's death.

It will be recalled that the purported will was dated October 29, 1958. L. J. MacKool, who is in the insurance business in Little Rock and who had known Mr. Black for many years, testified that in November, 1958, Mr. Black told him that he didn't have a will and didn't need one. This must have been only a few days after the purported will is alleged to have been executed.

Mr. E. W. Hardcastle had made Mr. Black's bank deposits for him every week over a period of many years, and Mr. Hardcastle was asked by Mr. Black to look after the drug store while Black was ill. Cecil Morton, who was working in the drug store, and who was named the principal beneficiary under the terms of the alleged will, was not asked to look after the store.

Mrs. Lorene Elrod, who worked for Mr. Black six days a week for three years, testified that Mr. Black did not trust Morton. Mary Butler worked for Mr. Black two years; she stated that Mr. Black showed no particular liking for Morton. About two months before his death Mr. Black told a Mrs. Ripley that he did not intend to make a will.

Following Mr. Black's death, Walter L. Black, Jr., was appointed administrator of the estate and as such continued to operate the drug store. He testified that he fired Morton for stealing, and as Morton went out the door he stated "You'll be sorry."

When the purported will was offered for probate, of course it was easily determined that it was not written on the typewriter owned by Mr. Black and located in the drug store; nor was it written on Mrs. Hardcastle's portable typewriter which she sometimes carried to the Black home to do her work as a bookkeeper. Of course, if the will was not written on the typewriter at the store, and was not written on the typewriter known to be at

the home on some occasions, it might give rise to an inference that Mr. Black did not write the will at all. There is not a scintilla of evidence that he ever did any of his work at any other place.

To explain away this inference, Mrs. C. C. Morton, the divorced wife of C. C. Morton, the principal beneficiary named in the will, testified that in July or August, 1958, she had a portable typewriter belonging to her married daughter, Mrs. Marvin K. Cook, and that at Mr. Black's request she loaned him this typewriter, and that he kept it until November, 1958. Although she says that Black borrowed the typewriter in July or August, 1958, the purported will is not dated until October 29, 1958. She produced the typewriter in question and it was shown to be the typewriter on which the purported will was written.

One of the attorneys for the contestants immediately got in touch by phone with Mrs. Cook at Fort Worth and asked her about the typewriter. Mrs. Cook told Mr. Reed Thompson, attorney for the contestants, that her father had given her the typewriter in 1947 or 1948; that she had lived at Blytheville, Arkansas, for a year and a half, moving from there on September 7, 1958; that she had the typewriter with her at Blytheville during the whole time she lived there, and that it was moved to Texas along with the other family belongings. It will be borne in mind that Mrs. Morton had just testified that she loaned the typewriter to Mr. Black in July or August, 1958. It appears that Mrs. Morton visited with Mrs. Cook in Texas from December, 1958, to February, 1959.

Mrs. Cook's testimony was not available at the first trial. This case was reversed by this Court the first time it was here, for the purpose of letting in the testimony regarding the whereabouts of the typewriter. When the case was tried on remand, attorneys for appellants had ascertained from Government records (Mr. Cook was in the Air Force) that when the Cooks moved from Blytheville to Fort Worth, a typewriter was among their

belongings. At the second trial, Mrs. Cook and her husband appeared as witnesses for the proponents of the will in support of the testimony of Mrs. Cook's mother, Mrs. Morton. The substance of their testimony given at that time is that the typewriter they had at Blytheville was an old one belonging to Mr. Cook and it was not the portable typewriter which Mrs. Cook had told Mr. Thompson that her father had given her and that she had with her during their entire stay at Blytheville. In her phone conversation Mrs. Cook had said nothing whatever to Mr. Thompson about the Cooks' having two typewriters.

It would not have been strange for Mr. Black to have left the bulk of his estate to his cousin, Miss Clio Thompson, according to her testimony. She testified that Black despised his brother, and yet the purported will leaves more to his brother than it does to Miss Thompson. Mr. Black thought a great deal of his aunt, Mrs. Roxie Thompson. She was an elderly lady, and it can be inferred that a little money would have eased to some extent her condition in life, and yet the purported will leaves her nothing. Miss Thompson testified that Mr. Black told her, "Aunt Roxie will understand," apparently meaning that she would understand why he had left her nothing in his will, and only about 25% of his estate to his family and about 75% to a man who for good reason he did not trust. We are convinced that the purported will is a forgery. The judgment is therefore reversed with directions to find against the will.