BLACK *v.* THOMPSON.

5-2802                                            361 S. W. 2d 753

Opinion delivered November 19, 1962.

*L. A. Hardin, Carl Langston, W. J. Walker,* for appellant.

*Alston Jennings, Sol J. Russell, C. Byron Smith, Jr.* and *Reed W. Thompson,* for appellee.

CARLETON HARRIS, Chief Justice. This is the third appeal involving some phase of the Ward Millard Black estate. The first two cases involved the validity of a purported will of the decedent.[1] In the first case, we reversed and remanded for additional proof, and in the second case, we held that the purported will was a forgery, and reversed the findings of the trial court.

The present appeal stems from an order of the Pulaski County Probate Court, allowing attorney fees of $2,500 to appellees for services rendered in representing Clio Thompson, administratrix of the estate of Black.

[1] For a detailed discussion of the facts, see *Black* v. *Morton,* Law Reporter of February 27, 1961, 343 S. W. 2d 437, and *Black* v. *Morton,* Law Reporter of December 18, 1961, 352 S. W. 2d 177.

It might be here pointed out that appellees only asked for fees for representing the estate, and not for defending the will. Appellant, Walter L. Black, Jr., a nephew of the decedent, and sole heir of the estate,[2] contends that appellees are entitled to no fee whatsoever. Appellees have cross-appealed, contending that the fee allowed by the court was inadequate. Appellant asserts that appellee attorneys entered into a contingent fee contract with the beneficiaries of the purported will, whereby the former were to receive one-third of the estate if the will was finally (following trial court hearings and appeals) admitted to probate, and since such will was declared of no effect, appellees are not entitled to compensation. He calls attention to the provision of Section 62-2209, Ark. Stats. Anno. (1957), which provides,

"When any person nominated in a will as executor or the administrator with the will annexed, in good faith defends it or prosecutes any proceedings for the purpose of having it admitted to probate, whether successful or not, he shall be allowed out of the estate his necessary expenses and disbursements including reasonable attorney's fees in such proceedings."

Appellant maintains the key language of the statute is "in good faith," and asserts that the record shows that Clio Thompson, as a proponent of the forged will, did not act in good faith.

In the first place, we do not agree that the allowance of the attorney's fee is dependent upon the good faith of the administratrix,[3] but since appellant urges that this is controlling, we will briefly discuss the contention. In our view, the record does not support the allegation that Miss Thompson was not acting "in good faith". Miss Thompson and Mrs. Olive Perzigian were cousins of the deceased, and were both beneficiaries under the forged will; however, the purported bequest to these two, along with purported bequests to two other

---

[2] Walter L. Black, Sr., a brother of Ward Millard Black, died during the pendency of the will contest. The estate is valued at over $100,000.

[3] Of course, no fee would be allowable to the administratrix unless the will was offered for probate in good faith.

members of the family amounted to only an approximate 25% of the total estate. The principal beneficiary of the instrument was Cecil C. Morton, ex-convict, and employee of the drug store operated by Ward Millard Black; according to the terms of the "will", Morton was beneficiary of approximately 75% of the estate. A reading of the two opinions in the *Black* cases will, we think, leave the reader with the unqualified view that the forgery was instigated, and carried out, by Morton, and others acting under his influence or direction. Certainly, the last opinion makes clear that this was the feeling of our court. Be that as it may, the testimony fell far short of establishing that Miss Thompson had any part in a conspiracy to forge the will, and it might be mentioned that her general background is not at all compatible with the role of a forger. She is principal of the Lamar High School, and the evidence leaves the impression that she is a responsible citizen.[4] We cannot assume that people act "in bad faith", nor does the record in the original case so indicate. According to the testimony in that case, Miss Thompson was advised some 10 months after the death of Black that her cousin had left a will, and the will was delivered to her. This information was voluntarily given by one of the witnesses, who, according to the evidence, was unknown to Miss Thompson prior to the delivery of the instrument. Actually, she would have been remiss in her duty had she failed to offer the will for probate (since it was not established that she helped procure it). Surely, no one could logically contend that Miss Thompson should have destroyed or thrown away the "will"; after all, there were other beneficiaries named in the instrument, members of the family, who, unquestionably, had no part in any forgery, and were entitled to have same offered for probate. These beneficiaries,

---

[4] The record in the first case (made a part of the record herein) discloses that Miss Thompson holds a Bachelor of Arts degree from College of the Ozarks, a Master's degree from the University of Arkansas, and 30 hours graduating credit from the University of Oklahoma and Northeastern State Teachers College. During the war, she was with the War Department as an instructor in the Armed Service Forces Technical Command. She has also worked for the United States Treasury Department and in the Comptroller's Division of Douglas Aircraft Corporation.

most likely, would have "raised the roof" if Miss Thompson had refused to proceed. The very fact that the probate court admitted the will to probate is a strong circumstance within itself that she was entirely justified in offering it for admission.

However, as stated at the outset of the preceding paragraph, we do not consider that the "good" or "bad" faith of Miss Thompson in offering the will for probate, is controlling as to the allowance of the attorneys' fee. Rather, we think the fact that these attorneys were *appointed by the court* to represent the administratrix of the estate, and thereafter rendered service in behalf of the estate, entitles them to remuneration. After all, once they were appointed, the duty of advising the administratrix, and performing necessary functions in behalf of the estate, was incumbent upon them, and they were accountable to the court for the manner in which they discharged those duties. If the probate court has the authority to appoint attorneys (and it has such authority), then, certainly, it has the power to recompense them for their services. The probate court would be indeed impotent if it were powerless to compensate those that it has appointed to perform certain functions. We are not here concerned with any contract that might have been entered into between appellees and beneficiaries under the purported will; we are *only* concerned with the acts of the attorneys in representing the administratrix, and the estate, as directed by the probate court. The amount of the fee allowed by the court is not questioned by appellant; he simply insists that no fee at all should be granted. The record reflects that appellees were appointed attorneys for the estate on June 21, 1960, and they have served as attorneys for the estate since that time. When Miss Thompson was authorized to take charge of the drug store on that date, she found that appellant, former administrator, had surrendered the drug and narcotic permit, and it was, of course, necessary that another be obtained. According to her testimony, the lawyers worked two to three weeks assisting in negotiating with the proper authorities for restoration

of the permit. She stated that she sought the advice of the attorneys once a week in administering the estate,[5] but the record does not make clear the period of time covered by these conferences; nor did the witness specify the problems encountered, or the nature of the advice given. Of course, advice rendered, relative to the will contest, cannot properly be considered in the matter before us. The testimony reflected that the total cash receipts from June 21, 1960, through January 31, 1962, were $159,006.80. Other than assisting in obtaining the permit, and rendering the legal advice mentioned, no specific acts of service to the estate are shown by appellees (who did not testify), but we think the amount allowed by the court was justified, and, according to the transcript, prior attorneys, representing the estate at the time appellant was serving as administrator, were allowed a fee of $3,000.

Appellees have cross-appealed, contending that they are entitled to a fee of $7,000 under the provisions of Sub-section (d) of Section 62-2208, 1961 Supp. That section sets out the fee that shall be allowed to attorneys, basing same on the market value of real and personal property reportable in the probate court. Appellees (cross-appellants) assert that provisions of this statute are mandatory. We are not here required to decide whether the legislature can establish mandatory fees — thus taking away all judicial discretion, because the section relied upon also provides, "the attorney so employed shall prepare and present to the Probate Court all necessary notices, petitions, orders, appraisals, bills of sale, deeds, leases, contracts, agreements, inventories, financial accounts, reports and all other proper and necessary legal instruments * * * and for *said*[6] legal services such attorney * * * shall be allowed a fee based on the total market value of the real and personal property reportable in the Probate Court." There is no showing in the present record that counsel have performed these services. We find it difficult to believe that the General Assembly intended for an attorney to receive a fee based

---

[5] This would roughly total about seventy-five conferences.
[6] Emphasis supplied.

on a percentage of the property reportable in a probate court, *irrespective* of the amount of work done by the attorney. Such an interpretation would manifestly be unfair, for numerous estates require dozens of prepared orders, while others, of the same monetary value, require but few. The trial court seems to have been entirely familiar with the amount of work performed by appellees, and the services rendered to the estate. It placed a value upon those services, and we are unable to say that the court's finding was erroneous.

Affirmed on both direct and cross-appeal.

Justices SMITH and ROBINSON dissent.

GEORGE ROSE SMITH, Associate Justice, dissenting. The attorneys who are now demanding a fee from the estate represented the proponents under a contingent fee contract which would have entitled them to a fee of about $35,000 if the will had been upheld. If, however, the will was declared to be a forgery, as proved to be the case, they would receive nothing.

I think the contracting parties evidently intended that the attorneys' compensation be governed solely by the contingent fee contract. If the validity of the will had been sustained the attorneys would have been entitled to one-third of the estate for their services. I am unable to believe that they would have demanded, much less have been entitled to, an additional fee for representing one of their clients in her capacity as administratrix.

But the will was found to be a forgery. Since the lawyers were to receive no extra compensation for representing the administratrix if the will had been upheld, it should follow that they receive no such extra compensation if the will be rejected. Otherwise they are in the position of collecting a contractual fee from their clients if they are successful in defending the will and of collecting a non-contractual fee from the appellant, as the sole beneficiary of the estate, if they are unsuccessful. The plain result of this view of the law is to encourage

the tender of a forged will in every instance, for its proponents have everything to gain and nothing to lose.

ROBINSON, J., joins in this dissent.